JOURNAL ENTRY AND OPINION
Appellant Tonja Hall appeals in these consolidated appeals from orders of the juvenile court granting legal custody of her two children to other relatives. Custody of Nigeria Carter, a five-year old, was awarded to Carolyn Williams, Hall's mother and the child's grandmother, with whom the child had already lived for two and one-half years. Custody of Carolyn Cook, an infant, was awarded to Carvin Cook, her father and Hall's boyfriend.
In March 1998, approximately two weeks after the birth of Carolyn, Hall was committed for the fourth time to a psychiatric institution against her will. Hall's mother and boyfriend reported that she was sitting in a darkened room ignoring the newborn and not attending to its needs. Hall was diagnosed at University Hospitals Hanna Pavilion with schizophrenia by psychiatrist Dr. Brian Roth, M.D., Ph.D., who prescribed anti-psychotic medications for her mental condition. Hall was non-cooperative as a patient, but her condition improved with medication, and she ultimately left the hospital against medical advice.
Dr. Roth expressed his concerns for Hall's children to Cuyahoga County Department of Family and Children Services (CCDCFS). CCDCFS investigated and the parties ultimately entered into a safety plan: Hall's mother would take the children to her residence in Arizona to care for them until Hall's condition sufficiently improved. Hall was not permitted to have unsupervised care of the children. Hall, however, subsequently went to Arizona by herself and returned with the children to Cleveland.
On April 15, 1998, CCDCFS removed the children from Hall's custody. Two days later, CCDCFS filed complaints for temporary custody of Hall's two children on the grounds that they were dependent. The complaints alleged:
 1. Mother has a history of mental illness, as she has been probated on three separate occasions. On 3/16/98, mother's psychiatrist contacted CCDCFS stating that she is not competent to care for either of her two children.
 2. Mother has a diagnosis of schizophrenia and refuses to maintain her psychiatric and medical care. Mother's failure to take her prescribed medications places the children at risk of serious harm and danger.
 3. On 3/18/98, maternal grandmother and the alleged father of the children, Ca[r]vin Cook, signed a Safety Plan agreeing to never leave the mother home alone with the children and to continuously oversee the care of the children. It was later agreed by all parties that the children could reside in Arizona with the grandmother until the mother becomes stable. These agreements were violated on 4/13/98 when the mother transported the children From Arizona to Cleveland without the maternal grandmother and Mr. Cook being present.
CCDCFS was granted temporary emergency custody and filed a case plan for reunification.
Hall thereafter sought to regain custody of the children. On June 19, 1998, the juvenile court conducted a hearing. The parties disputed Hall's mental condition and the effect it had on caring for the children. During the hearing the parties presented conflicting medical opinion testimony to support their respective claims.
CCDCFS called Dr. Roth to testify concerning his diagnosis and treatment of Hall. Dr. Roth stated that he was licensed to practice medicine for ten years and psychiatry for the last seven years. He has a Ph.D. in biochemistry, is an associate professor of psychiatry at Case Western Reserve University, and serves on the medical staff at University Hospital at the Hanna Pavilion psychiatric facility. Dr. Roth testified concerning Hall's prior psychiatric history and tests conducted to evaluate her condition.
Hall was unable to carry on a conversation, manifested paranoid ideations, exhibited thought blocking, and was not bathing or combing her own hair. During testing, she was able to achieve an IQ of only 75, one standard deviation below the mean. Dr. Roth's ability to diagnose her condition was limited by her refusal to cooperate. She appeared to suffer a chronic series of episodic psychoses. He diagnosed schizophrenia versus schizophrenic born psychosis. He noted that even if his diagnosis were incorrect, she suffered from some other serious episodic psychotic illness.
Roth believed Hall had a good prognosis if she took prescribed medicine and sought psychiatric care. Although she had improved with medicine, she refused, however, to continue taking it. The doctors did not seek a court order to compel her to take her medicine, because they believed she had become competent to refuse. She was thereafter discharged in a disorganized state with no coherent plan to care for her children. Roth contacted CCDCFS because of his concerns for their welfare.
Hall presented testimony from psychology assistant William Miller, whom she had seen after Dr. Roth, and social worker Jeanette Nameth. Miller had a Master's degree in psychology, was working on his Ph.D., and was practicing under licensed psychologist Dr. Raymond Richetta. Miller testified that, when he saw and tested Hall, she was normal and her test results were within normal limits. He saw her on four occasions, but did not consult with Dr. Roth or obtain all her medical records from her recent treatment at University Hospitals.
Miller believed there was some reason for her four prior hospitalizations. He admitted concern about her continuing denial and blaming her mother for committing her. He also believed she would benefit from counseling, but she refused to participate. He acknowledged one prior incident of violence at a hospital where she was accused of striking another patient. He did not believe that her children were at risk if another adult was present.
CCDCFS social worker Nameth recounted that Hall's mother and boyfriend informed her that Hall was not taking care of her children or feeding and bonding with the newborn. Hall subsequently violated the safety plan by going to Arizona and retrieving the children without supervision. The children were then placed in a foster home. She believed CCDCFS should retain custody of the children because Hall was not complying with recommendations of Dr. Roth or Miller. She admitted, however, that she never personally observed anything wrong with Hall's care for her children.
Following the hearing, the court terminated CCDCFS' emergency custody and returned legal custody of the children to Hall subject to protective supervision by CCDCFS. The court specifically ordered that she continue treatment and take her prescribed medication. During the course of a subsequent hearing on July 16, 1998, the juvenile court again specifically discussed with Hall the requirement that she continue treatment and take all prescribed medication. She was referred to Informing Our Children, Inc. social service agency and the court scheduled an adjudicatory hearing for three months later.
On August 14, 1998, approximately one month after custody was returned to Hall, the social service agency called CCDCFS to report an emergency. Carvin Cook reported that Hall had threatened him with a hammer. He was able to get custody of the infant, but the five-year-old was upstairs in the bedroom. The children were again taken into emergency custody by CCDCFS.
The matter thereafter proceeded to the scheduled final adjudication and dispositional hearing. At the outset of the hearing, the parties agreed to amend the original complaint, inter alia, from one seeking temporary custody to one seeking a change in legal custody. The amendment to the complaint specifically requested that Hall's mother obtain custody of Nigeria, and Cook obtain custody of Carolyn. Hall's counsel expressly stated, on the record in open court, that he had no objection to the amendment. (October 8, 1998 Tr. at p. 4.) The parties also again stipulated to the admissibility of the expert opinion testimony from the prior June 19, 1998 temporary custody hearing.
CCDCFS presented testimony from two additional witnesses. Doreen Berts, executive director of the social service agency Informing Our Children, Inc. testified that she began working with Hall after the children were returned to her in July 1998. She visited Hall's residence two to three times a week. She always saw Cook taking care of the children and never saw Hall holding or bonding with the newborn. Nigeria always mentioned her grandmother. Hall was focused on her own schooling, not on her children, and was ultimately disenrolled from the program.
Berts was called at 11:00 in the evening on August 13, 1998 by Cook who reported that Hall had threatened him with a hammer. Cook wanted Hall to calm down and take her medicine. Berts reported the hammer incident to CCDCFS, which obtained emergency custody of the children the following morning.
CCDCFS social worker Katrina Pritchett testified about how the agency first obtained the case, how it filed a case plan, and the efforts it made to obtain assistance for Hall. She testified how Dr. Roth reported his concerns about the safety of the children following Hall's discharge. Hall then violated the safety plan and went to Arizona to resume custody of the children. The children were returned to CCDCFS' custody less than one month after the court restored legal custody to Hall subject to protective supervision. Pritchett reported that several days prior to the hearing, Hall appeared in Nigeria's school classroom and created a serious incident. Hall told the teacher assigned to the class that Hall was a substitute teacher for the day, although she was not. Pritchett testified that Hall denied any mental illness, refused to take prescribed medication, and discontinued treatment with mental health professionals.
Hall thereafter testified on her own behalf and presented testimony from Cook. Hall stated she graduated from Kent State University in 1998 with a Bachelor's degree in business administration and was currently seeking a Master's degree in education. She was also a substitute teacher in the Cleveland Public Schools. She denied any mental health problems and stated she was concerned about taking medicine, and none was currently prescribed. Hall stated that Cook hit her on one occasion. She said he was probably drunk, but admitted that he never drank too much.
Cook testified that, during the hammer incident, he was not personally afraid but was afraid for his child's safety. He had to trick Hall to get Carolyn out of the house, but she would not let him get Nigeria. Cook stated that when the children were returned to Hall's custody, she did not provide any care. She went to school four to five times a week and was more concerned with getting high grades and her busy schedule. Cook thereafter testified on his own behalf and denied striking Hall. He testified that she made up the story in an effort to continue the proceedings. Cook could not understand why Hall refused to take her pills. He believed the children would be better off without all the chaos of living with Hall.
Following closing arguments, the court found, by clear and convincing evidence, that the children were dependent. The court immediately proceeded, without objection, to a dispositional hearing. CCDCFS argued that legal custody of Nigeria should be granted to Williams, her grandmother, and legal custody of Carolyn should be granted to Cook, as requested in the amended complaint. Hall sought legal custody of both children and Cook sought legal custody of Carolyn. The guardian ad litem for the children filed a report which stated that it was in the best interest of the children for legal custody to be granted as requested by CCDCFS. The guardian ad litem for Hall likewise stated that it was in the best interest of Hall for the children to be in the custody of their relatives.
The juvenile court granted legal custody of Nigeria to Williams and legal custody of Carolyn to Cook as requested in the amended complaint. Through newly appointed appellate counsel, Hall raises three assignments of error.
Hall's first assignment of error follows:
 THE TRIAL COURT ERRED IN FINDING THAT THE MINOR CHILDREN OF APPELLANT ARE DEPENDENT BECAUSE THE DEPARTMENT OF CHILDREN FAMILY SERVICES FAILED TO DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN ARE DEPENDENT.
This assignment lacks merit.
Hall argues the record does not contain sufficient evidence to support the trial court's finding that her two children were dependent. She contends that, although children can be found to be dependent when they are not adequately cared for by a parent because of mental illness, there was not sufficient evidence to find that she suffered from a mental condition that impaired her ability to care for her children. She argues that such a finding was precluded in the case at bar because she presented contrary testimony from her own expert, was seeking a Master's degree in Education, served as a substitute teacher in Cleveland Public Schools, and maintained a mortgage on her own home.
Although we concede that Hall presented evidence in support of her claim, there was clear and convincing evidence to permit a finding that Hall suffered from mental illness which impaired her ability to care for her children. See In re S. (1995), 102 Ohio App.3d 338,344-345; In re Brown (1989), 60 Ohio App.3d 136, 137. Dr. Roth, an M.D., Ph.D., and psychiatrist, had a superior opportunity to observe Hall during her hospitalization to make his diagnosis. Assistant psychologist Miller, Hall's expert, had less education, less experience, and less of an opportunity to observe her. He did not consult with Dr. Roth or obtain all Hall's medical records from her treatment at University Hospitals.
Under the circumstances, the trial court could properly grant more weight to Dr. Roth's testimony when resolving any conflicts in the testimony. Contrary to Hall's argument, the mere fact that parties present conflicting evidence does not render it impossible to make a finding by clear and convincing evidence. In this case, moreover, both experts agreed on one central point: that Hall should undergo further treatment. Both were concerned by her complete denial that any problem existed.
Finally, even if the juvenile court's decision to restore custody to Hall after the June 19, 1998 hearing were correct, the trial court could properly conclude that subsequent events put the matter in a different light. Within less than one month of Hall obtaining custody under protective supervision, CCDCFS received an emergency call about the hammer incident.
The parties also presented more evidence during the final hearing concerning the adverse effect of Hall's condition on her care of the children. Berts, Pritchett, and Cook all testified for the first time about Hall's ongoing failure to provide proper care. By their accounts, Cook was the sole source of parental care for the two children. Hall deprived them of such care by making Cook leave by threats with a hammer. Under the totality of the circumstances, the trial court could properly conclude, by clear and convincing evidence, that the children were dependent because Hall deprived them, and failed to provide them with, adequate parental care by reason of her mental condition. R.C. 2151.04(B).
Accordingly, Hall's first assignment of error is overruled.
Hall's second assignment of error follows:
 THE TRIAL COURT COMMITTED PLAIN ERROR, AND APPELLANT WAS THEREBY DEPRIVED OF HER RIGHT TO PROCEDURAL DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION WHEN THE COURT AWARDED LEGAL CUSTODY OF CAROLYN C. TO CARVIN COOK AND LEGAL CUSTODY OF NIGERIA C.
 TO CAROLYN WILLIAMS EVEN THOUGH NEITHER PARTY FILED A MOTION FOR LEGAL CUSTODY AS REQUIRED BY OHIO REV. CODE SECTION 2151.353(A)(3).
This assignment lacks merit.
Hall's brief on appeal argued for the first time the trial court could not grant legal custody of Nigeria to her mother and Carolyn to Cook, the child's father, because neither party had filed motions requesting such relief.
Hall's newly minted argument ignores, however, that the original complaint was specifically amended before the adjudicatory hearing to request this precise relief. The record unambiguously reveals that Hall's trial counsel specifically stated he had no objection to such amendment. The trial court thereafter expressly permitted the amendment and made the changes by interlineation on the original complaint filed in the case.
It is well established that a deliberate decision by counsel not to object at trial precludes a claim of plain error for the first time in a subsequent appeal. See State v. Edwards (1985),26 Ohio App.3d 199, 201. Under the circumstances, Hall waived any claim of error by failing to raise it in the trial court and the trial court did not commit plain error by proceeding as it did in the case at bar.
Even if Hall had not waived this belated argument, she has not shown reversible error. Juv.R. 22(B) specifically governs the amendment of pleadings and provides in pertinent part as follows:
 Any pleading may be amended at any time prior to the adjudicatory hearing. * * * Where requested, a court shall grant a party reasonable time in which to respond to an amendment.
The record shows that the original complaint was amended before the commencement of the adjudicatory hearing. The amendment did not raise any new substantive allegations, but merely sought alternative relief upon a finding of dependency. Not only did Hall's counsel fail to object to the requested amendment, but counsel never sought a continuance. Hall simply adhered to her request for custody of the children. Under the circumstances, she has not alleged or shown that the trial court abused its discretion by permitting the amendment or any resulting prejudice.
Hall argues that this court's opinion in In the Matter of Fleming (July 22, 1993), Cuyahoga App. No. 63911, unreported, dictates a contrary result. However, Fleming involved a last minute oral motion for legal custody made in violation of several Juvenile and Civil Rules. Unlike the case at bar, none of the parties in Fleming sought to amend the complaint pursuant to Juv.R. 22(B). Moreover, unlike Fleming, Hall has not shown any violation of the Juvenile Rules or error in connection with the amendment to the complaint in the case at bar. As a result, Hall's claims of plain error and denial of procedural due process lack merit.
Accordingly, Hall's second assignment of error is overruled.
Hall's third assignment of error follows:
 APPELLANT WAS DEPRIVED OF HER RIGHT TO PROCEDURAL DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION AS A RESULT OF THE FAILURE OF THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES TO FILE A CASE PLAN AS REQUIRED UNDER OHIO REVISED CODE SECTION 2151.412(C).
This assignment lacks merit.
Hall's brief on appeal argued that CCDCFS did not file a reunification plan in the case at bar. When CCDCFS's brief pointed out that a plan had been filed, Hall's reply brief conceded that it had been filed, but changed her argument to complain that she did not sign the case plan and did not receive a copy of it.
Hall no longer disputes that CCDCFS filed an extensive case plan time-date stamped June 9, 1998 at 1:40 p.m. The plan required her to complete a full psychological evaluation and to follow the recommendations of [her] psychiatrist. She now complains that she never received a copy of the document.
The Franklin County Court of Appeals rejected this same argument under similar circumstances in In the Matter of Tucker (Feb. 8, 1990), Franklin App. Nos. 89AP-365 and 89AP-366, unreported. The Tucker Court stated in part as follows:
 Appellant also contends that she did not receive a copy of the comprehensive reunification plan as required by statute. The record is unclear whether or not appellant received a copy of the comprehensive reunification plan from the court and, absent evidence to the contrary, this court will presume the regularity of the trial court proceedings.
Id. at 2 (citation omitted.) We need not rely solely on a presumption of regularity, however, to reject Hall's argument.
As in Tucker, Hall likewise makes no persuasive claim that she was unaware of her obligations under the plan. The trial court's original order restoring custody of the children to Hall, subject to protective supervision by CCDCFS, specifically ordered Hall to continue treatment and take her medication. The trial court specifically discussed these requirements with Hall on the record in open court on July 16, 1998. Even if she did not physically receive a copy of the plan, Hall cannot show any prejudice, because she knew precisely what was expected of her. Id.
This case is and always has been about her refusal to cooperate with mental health professionals. While medical professionals may have different opinions about her condition, even her own chosen expert, psychology assistant Miller, recommended ongoing counseling, but she refused to participate. Her own guardian ad litem, as well as the guardian ad litem for the children, recognized that it was in no one's best interest for her to care for the children under the circumstances. Absent another acute episode, no one can force her to undergo any mental health treatment, but she knew from the outset that her failure to do so would jeopardize her custody of the children.
Accordingly, Hall's third assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court Division of the Common Pleas Court to carry this judgment into execution.
LEO M. SPELLACY, J., and JAMES M. PORTER, J., CONCUR.
DIANE KARPINSKI, PRESIDING JUDGE